IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

ROGINA RENEE EVANS                                                                    PLAINTIFF

v.                                    Civil No. 10-3105

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                        DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Rogina Evans, brings this action under 42 U.S.C. § 405(g), seeking judicial review of

a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for

disability insurance benefits ("DIB") and supplemental insurance benefits ("SSI") under Titles II and XVI

of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this

judicial review, the court must determine whether there is substantial evidence in the administrative

record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

I.      **Procedural Background:**

The plaintiff filed her applications for DIB and SSI on March 4, 2007, alleging an onset date of

February 7, 2007, due to bipolar disorder, chronic pseudo-seizures, chronic obstructive pulmonary

disease ("COPD"), and chronic and severe migraine headaches.  Tr. 55, 103-111, 187-188.  Her

applications were initially denied and that denial was upheld upon reconsideration.  Tr. 62-68, 73-76.

Plaintiff then made a request for a hearing by an Administrative Law Judge ("ALJ").  An administrative

hearing was held October 1, 2008.  Tr. 49-61.  Plaintiff was present and represented by counsel.

At this time, plaintiff was 39 years of age and possessed a high school education. Tr. 15, 17.  She

had past relevant work ("PRW") experience as a care giver for United Cerebral Palsy, waitress, and day

care worker.  Tr. 18-20, 144-151.

On December 10, 2008, the ALJ found that plaintiff's pseudo-seizures, bipolar disorder, COPD,

and asthma were severe, but did not meet or medically equal one of the listed impairments in Appendix

1, Subpart P, Regulation No. 4.  Tr. 55-56. After partially discrediting plaintiff's subjective complaints,

the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform work at all exertional levels, but must avoid all exposure to hazards, such as unprotected heights and heavy machinery; cannot drive; must avoid concentrated exposure to dust, fumes, and poor ventilation; and, could only perform unskilled work where the interpersonal contact was incidental to the work performed. Tr. 56-60.  With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a grocery stocker, dishwasher, assembler, and machine tender.  Tr. 60-61.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on September 24, 2010. Tr. 1-5.  Subsequently, plaintiff filed this action. ECF No. 1.  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.   ECF No. 6, 7..

II.     **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and

that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

## III.    Discussion:

Of particular concern to the undersigned is the ALJ's failure to properly consider Plaintiff's mental impairments. We note that the evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment. *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996). Evidence of symptom-free periods, which may negate the finding of a physical disability, do not compel a finding that disability based on a mental disorder has ceased. *Id*. Mental illness can be extremely difficult to predict, and remissions are often of "uncertain duration and marked by the impending possibility of relapse." *Id.* Individuals suffering from mental disorders often have their lives structured to minimize stress and help control their symptoms, indicating that they may actually be more impaired

AO72A
(Rev. 8/82)

than their symptoms indicate. *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir.2001); 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E) (1999).  This limited tolerance for stress is particularly relevant because a claimant's residual functional capacity is based on their ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir. 1982) (abrogated on other grounds).

In the present case, Plaintiff has been diagnosed with conversion disorder, psychogenic or pseudo-seizures, post-traumatic stress disorder ("PTSD"), and personality disorder. Conversion disorder is a condition in which a person has neurological symptoms that cannot be explained by medical evaluation.  Symptoms usually begin suddenly, following a stressful event, and often include psychogenic seizures. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1574-1575 (Robert S. Porter et al. eds., 19th ed. 2011).  Psychogenic seizures outwardly appear similar to epileptic seizures, but are seizures caused purely by the emotions.  Ronald P. Lesser, *Treatment and Outcome of Psychogenic Nonepileptic Seizures*, 3 Epilepsy Currents 198,  198-200 (Nov. 2003).

Records indicate that Plaintiff began suffering from seizures in 2007, following the dissolution of an abusive (mental, physical, and sexual) marriage.  Tr. 234, 256-257, 323.  On February 16, 2007, Plaintiff's treating physician completed a treating physician's report for seizure disorder.  Tr. 256-257. He indicated that Plaintiff had experienced five seizures since her last appointment on April 16, 2007, but typically experienced up to 15 seizures per day.  Her seizures were said to include tongue biting, loss of consciousness, urination or defecation, postical antisocial behavior, convulsions, and confusion.  The doctor stated that Plaintiff's last medication adjustment occurred on April 16, 2007, and her most recent EEG revealed normal results in February 2007.  Tr. 256-257.

On February 18, 2007, Plaintiff was hospitalized for these seizures, which were determined to be of unknown etiology.  Tr. 533-542.  A physical examination was normal, and an EEG showed no evidence of epilepsy.   Plaintiff explained that her spells were associated with a limp body,

4

unresponsiveness, and some difficulty breathing.  She also reported a metal taste in her mouth just before

experiencing a spell, and stated that the spells lasted two to three minutes and occurred several times per

day.  Her spells were followed by abnormal speech with infantile pronunciation of words and relatively

reduced verbal output.  Dr. Richard Chitsey assessed her with seizure-like episodes and discharged her

with instructions to pursue follow-up and ongoing psychiatric care.  He also placed her on seizure

precautions.  Tr. 533-542.

On February 22, 2007, Plaintiff indicated that she had been diagnosed with psychogenic seizures

and prescribed Klonopin. Tr. 261.  However, she continued to complain of frequent seizure activity.  Dr.

Klepper diagnosed her with COPD, diabetes, and psychogenic seizures.  He advised her to schedule an

appointment with Visa Health as soon as possible, to continue her medications, and to return in two

weeks.  Tr. 261.

On March 4, 2007, Plaintiff was taken to the emergency room because she was experiencing

several seizures per day.  Tr. 280-285.  She had not spoken since the previous day and was exhibiting

carpal pedal spasms.  The seizures continued while in the ER.  An examination revealed full orientation,

but Plaintiff was anxious, tearful, inappropriate, and nonverbal.  Her hand grip was strong and symmetric,

no muscular weakness was noted, and she exhibited an intact range of motion for all extremities.  A CT

scan was ordered, and Plaintiff experienced one pseudo-seizure while on the table.  The CT scan revealed

no acute abnormality.  Plaintiff was diagnosed with asthma, bipolar disorder, diabetes, and PTSD.  Tr.

280-285.

On April 1, 2007, Plaintiff was again admitted due to "hysterical seizures."  Tr. 300-315.  She

had reportedly experienced a seizure while at church, following a stressful week and weekend.  Tr. 412-

418. Her global assessment of functioning was assessed at 50.  Drug testing was negative, and her exam

was otherwise normal. She had some tremulousness, but it was felt that her psychological disorder was

causing her to experience pseudo-seizures.  Plaintiff continued to experience seizure like activity without

AO72A
(Rev. 8/82)

improvement, even after the implementation of Valium.  Dr. Klepper felt she was at significant risk for

self harm, but social services found her ineligible for psychiatric in-patient treatment.  Valium and other

medications were withdrawn, and her seizures improved.  Plaintiff was released home on April 4, 2007,

with diagnoses of pseudo-seizures, bipolar disorder, PTSD, Type II diabetes, and COPD.  Dr. Klepper

advised her to seek outpatient counseling services.  Tr. 300-315.

At her April 2007 medication management appointment with psychiatrist Dr. Dante Durand,

Plaintiff reported nightmares, pseudo-seizures, and anxiety, especially at night.  Tr. 419-420.  She was

very stressed because her ex-husband was stalking her.  Plaintiff was  waiting for a Judge to grant her

request for a protective order.  Dr. Durand diagnosed her with conversion disorder and increased her

Topamax dosage.  Tr. 419-420.

Although her seizures did decrease in frequency, following the entry of the Protective Order, the

seizures returned when her ex-husband and his girlfriend began harassing her again.  Tr. 421-422.

Financial problems also seemed to trigger anxiety, resulting in an increase in the frequency of her

seizures.  Tr. 423-424.

On May 26, 2007, Plaintiff underwent a mental diagnostic evaluation with Dr. W. Charles

Nichols.  Tr. 353-358.  She reported a history of seizures, PTSD, depression, and anxiety, but stated she

could not work due to seizures.  Upon entering Dr. Nichol's office, she immediately announced she was

"feeling an 'aura'"that included a metallic taste and stuttering.  She asked if her mother could come into

the office and, upon her mother's entry, immediately began experiencing left hand and arm tremors.

When asked to describe her PTSD symptoms, Plaintiff stated that her body "shuts down" and "goes into

a seizure" when she feels "stressed."  She denied any history of seizures prior to February 2007, and

indicated that a neurologist in Little Rock had concluded they were not neurologically based.  Plaintiff

indicated that her exhusband was emotionally and physically violent, and this was likely a trigger for her

symptoms.  She also reported some childhood abuse, which she stated triggered her anxiety symptoms.

6

When speaking about her symptoms, Dr. Nichols noted that her speech was poorly articulated, as if she had experienced a stroke. However, she spoke fluently and without stuttering when not talking about her symptoms. Her mood was depressed, affect mildly dysphoric with considerable affect construction, and thought processes were goal directed. Dr. Nichols diagnosed Plaintiff with depressive disorder not otherwise specified and assessed her with a GAF of 63.[1] He found that her symptoms minimally interfered with her activities of daily living, she interacted in a dependent and insecure manner until the onset of her pseudo-neurological symptoms began, she responded to the tasks of the interview with poor mental efficiency, she showed inconsistent attention for basic cognitive tasks and historical questions, she exhibited poor persistence, and she displayed signs of psychomotor slowing expected to interfere with job-like tasks. However, he also noted that her symptoms seemed to worsen as the focus of the interview moved toward her problems. She stared blankly at a few points after being asked questions, but then "snapped" visibly back with a motion and answered the question, suggestion she was listening and could recall the question during those "blank moments." Malingering was suspected but could not be established with a reasonable degree of certainty. Tr. 353-358.

On December 11, 2007, Plaintiff underwent a master treatment plan review at Ozark Counseling Services ("OCS"). Tr. 561-563. She was diagnosed with bipolar I disorder, PTSD, conversion disorder with seizures/convulsions, amphetamine dependence in full remission, and personality disorder not otherwise specified. Plaintiff's GAF was assessed at 40,[2] and it was noted that she could not speak of her past abuse without having a seizure. The number and frequency of her seizures was "about the same." It was noted that she had experienced a seizure during her last appointment. Tr. 563.

---

[1] A GAF of 63 is indicative of mild symptoms or some difficulty in social, occupational, or school functioning. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 32 (4th ed. 2000).

[2] A GAF of 40 reveals an impairment in reality testing or communication or a major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 32 (4th ed. 2000).

AO72A
(Rev. 8/82)

On December 18, 2007, Plaintiff again sought emergency treatment due to seizure activity. Tr. 568-579. Following the seizure, she exhibited bizarre behavior and complained of a headache. She was alert and answered questions, but her speech was hard to understand. A CT scan of her head was normal. Plaintiff was diagnosed with generalized seizure, post ictal syndrome, confusion, idiopathic seizure disorder, lower back injury, and headache. Tr. 568-579.

On January 2, 2008, Plaintiff was again admitted due to psychogenic seizures. Tr. 596-612. She continued to experience seizures following admission. Plaintiff was administered Valium via her IV, but it had little effect on her seizures. Her seizure activity was documented by the hospital staff, and it was noted that she did stop seizing spontaneously. Plaintiff complained of severe pain, which she stated aggravated her seizures. She was evaluated by Dr. Hawk in pain management, but he did not feel that her pain was significant enough to warrant additional medication. Dr. Hawk believed she had a personality disorder with attention-seeking behavior versus malingering. Plaintiff was discharged on January 4, 2008, to be followed by OCS. Tr. 596-612.

By the end of January, Plaintiff's seizures had again increased in frequency and seemed to coincide with her migraine headaches. Tr. 614-616, 622, 636-637. In February 2008, Plaintiff was hospitalized for COPD and angina, and experienced several seizures during her admission. Tr. 664-679. In March, a revised treatment plan indicated that she remained unable to speak of her past abuse without experiencing seizures. At that time, her GAF was steady at 40. Tr. 642-644.

On May 14, 2008, Plaintiff reported multiple stressors to include a disobedient sixteen year old and financial problems. Tr. 632-633. She had an altercation with the front desk staff at OCS and became very anxious. Afterward, she indicated she was about to have a pseudo-seizure. However, with breathing techniques, she was able to work through it. Tr. 632-633.

On June 16, 2008, Plaintiff was transported to the ER after experiencing a seizure while at the pharmacy. Tr. 648-662. Paramedics arrived to find her seated in a chair. She was unresponsive to

8

questions and her speech was slurred.  In route to the hospital, Plaintiff experienced two more seizures.

During these seizures, her oxygen saturation rate was noted to drop from 98% to as low as 90%.  Active

tonic activity was noted.  Dilaudid and Zofran were administered, and Plaintiff was diagnosed with

pseudo-seizures. A CT scan of her brain was normal.  Tr. 648-662.

On July 2, 2008, Plaintiff's master treatment plan was again reviewed by Dr. Durand.  Tr. 638-641.  It was noted that she remained unable to speak of her past traumas and abuse without having a

seizure.  He again assessed her with a GAF of 40. Tr. 638-641.

On July 17, 2008, Plaintiff reported daily pseudo-seizures and anxiety. Tr. 628-629.  Dr. Durand

noted that Plaintiff was displaying splitting, which is common among individuals suffering from

borderline personality disorder.  Splitting causes a person to view themselves and other as either bad or

good, not understanding that good people can sometimes do bad things.  Tr. 628-629.

On September 17, 2008, Harold Masterson, Plaintiff's counselor at OCS completed a mental RFC

assessment.  Tr. 681-685.  He indicated that he had treated Plaintiff on at least thirteen occasions since

October 2007.  Her diagnoses included bipolar disorder I, PTSD, chronic conversion disorder, personality

disorder not otherwise specified, and psychogenic seizures.  Mr. Masterson noted that Plaintiff's

treatment consisted of medication management for control of her mood symptoms and anxiety, individual

therapy for coping skills, cognitive behavior therapy, and psychoeducation.  He indicated that she

experienced frequent, almost daily pseudo-seizures related to anxiety; mood changes; migraine

headaches; frequent anxiety attacks; low stress tolerance; and, decreased sleep.  Mr. Masterson noted that

her prognosis was guarded to poor.  He then concluded that she had no useful ability in the following

areas: maintaining regular attendance and being punctual within customary, usually strict tolerances;

completing a normal workday and workweek without interruptions from psychologically based

symptoms; performing at a consistent pace without an unreasonable number and length of rest periods;

accepting instructions and responding appropriately to criticism from supervisors; getting along with co-

9

workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; and, dealing with normal work stress. Mr. Masterson also found her to be unable to meet competitive standards with regard to maintaining attention for two hour segments, sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; asking simple questions or requesting assistance; carrying out detailed instructions; setting realistic goals or making plans independently of others; dealing with the stress of semiskilled and skilled work; maintaining socially appropriate behavior; traveling in unfamiliar places; and, using public transportation. He also concluded that she was seriously limited, but not precluded from remembering work-like procedures; understanding, remembering, and carrying out very short and simple instructions; being aware of normal hazards and taking appropriate precautions; understanding and remembering detailed instructions; interacting appropriately with the general public; and, adhering to basic standards of neatness and cleanliness. Mr. Masterson noted that Plaintiff had trouble leaving her home at times and experienced substantial difficulty in day-to-day activities outside the home. He indicated that her symptoms would cause her to miss more than four days of work per month. Tr. 681-685.        O n September 12, 2008, Plaintiff presented in Dr. Klepper's office while having a pseudo-seizure. Tr. 688. Her speech was kind of garbled, and she complained of a severe headache. All of the patient rooms were full and her family was panicking a little bit, so an ambulance was called to transport her to the hospital. Tr. 688. Reports of seizures continued into early October. Tr. 765-771.

On October 9, 2008, Plaintiff stated that she had experienced six seizures within an hours time. Tr. 752-764. Her speech was sluggish, but she was able to follow commands. The doctor diagnosed her with pseudo-seizures and psychogenic seizures. Tr. 752-764.

AO72A
(Rev. 8/82)

On October 20, 2008, Plaintiff experienced a seizure while in Ms. Taymore's office.  Tr. 703-704.  Geodon and Effexor XR were added to her regimen, and she was advised to taper off of the Lexapro.  Tr. 703-704.

On November 7, 2008, Plaintiff complained of a seizure, a headache, and incontinence.  Tr. 730-742.  She had taken four Ativan that day.  Her 17 year old son had left on Wednesday for Army boot camp and phoned the night before, crying and asking to come home.  A CT scan of her brain was normal.  Plaintiff was diagnosed with a pseudo-seizure and released home.  Tr. 730-742.

On November 10, 2008, Plaintiff sought emergency treatment for a migraine.  Tr. 714-728.  In triage, she requested a specific nurse and when told that nurse was with another patient, she became uncooperative, stiffened, and began to shake.  Plaintiff began to slide out of the chair and was assisted onto the floor and placed on her side.  She experienced four more of these episodes back to back, after which she closed her eyes and passed out.  Plaintiff experienced two more of these episodes while the nurse was trying to start her IV.  Tr. 714-728.

On November 14, 2008, Plaintiff presented for her medication management appointment with Karen Taymore, an advanced practical nurse at OCS.  Tr. 699-700.  Records indicate that Dr. Durand had moved out of town.  At this time, Plaintiff was sleeping okay and her energy was great, but she continued to feel anxious.  She was experiencing mild suicidal ideations, and reported continued seizures and panic attacks.  Ms. Taymore increased her Geodon and Effexor dosages and prescribed Buspar.  Plaintiff was advised to decrease her Ativan dosage and to discontinue Topamax.  Tr.  699-700.

On December 1, 2008, Plaintiff was again treated for a migraine and seizure activity.  Tr. 689.  She presented in the emergency room where she was administered Reglan, Benadryl, and Ativan.  Her condition improved, and she was released home.  Tr. 707-712.

On December 8, 2008, Plaintiff complained that the stress was getting to her.  Tr. 697-698.  She was experiencing anxiety attacks in Wal-Mart, and also had many physical problems to include shingles,

11

migraines, and seizures.  During her exam, Plaintiff was tearful and depressed. Ms. Taymore increased

her dosage of Effexor and prescribed Ativan for her increased anxiety.  Tr. 697-698.

We do note that Plaintiff reported some improvement in her seizures toward the end of December

2008.    However, as documented above, it is clear that Plaintiff suffered from frequent

psychogenic/pseudo-seizures from February 2007 until early December 2008, well over the minimum

one year period required to establish disability.

In determining Plaintiff is not disabled, the ALJ relied on Dr. Nichols' notation that she might

be malingering.  However, Drs. Nichols and Hawk, both one time examiners, were the only doctors to

suggest the possibility of malingering.  *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding

that the opinion of a consulting physician who examined the plaintiff once or not at all does not generally

constitute substantial evidence).  And, Dr. Nichols made clear that he could not diagnose malingering

with any degree of certainty.  Dr. Hawk also concluded that Plaintiff suffered from a personality disorder

that was the likely cause of her suspected malingering.  None of Plaintiff's treating doctors ever suspected

her of malingering.

Plaintiff's seizures were observed by various members of her medical treatment team and were

well documented in the record.  In fact, emergency room records reveal that these spells were associated

with a dip in her oxygen saturation rate, suggesting Plaintiff was not intentionally causing her symptoms.

The evidence also indicates that her seizures were the result of extreme emotional upset, related to her

previous abuse and her current financial condition, as is generally the case with psychogenic seizures.

Plaintiff's treatment plans at OCS indicated that she was unable to speak about her past abuse without

experiencing a seizure. Dr. Nichols' notations documenting her seizure-like symptoms when asked about

her PTSD or past abuse also lends credence to Dr. Durand's notation and a diagnosis of psychogenic

seizures.

12

We also note that Dr. Nichols evaluated Plaintiff on only one occasion, while Dr. Durand, Ms. Taymore, and Mr. Masterson treated Plaintiff for well over a year.  A thorough review of the record reveals that their records are consistent with the treatment notes of Dr. Klepper, Plaintiff's primary care physician.  20 C.F.R. § 404.1527(d)(2) (stating opinion of a treating physician is accorded special deference and will be granted controlling weight when well-supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000).  Further, we can find no internal inconsistencies within these records.  Accordingly, we find the ALJ's reliance on Dr. Nichols' one-time, consultative evaluation to be misplaced.  Remand is necessary to allow the ALJ to reconsider the evidence concerning Plaintiff's psychogenic/pseudo-seizures and conversion disorder.  Should the ALJ have questions concerning these disorders, he should contact Plaintiff's treating physicians.

The ALJ also concluded that Plaintiff's migraine headaches constituted a non-severe impairment. We note, however, that Plaintiff sought treatment for her migraine headaches on  at least 17 occasions during the relevant time period.  Tr. 410-411, 565, 614-616, 622, 636-637, 687, 689, 690, 691, 692, 693, 698, 744-750, 752-764, 765-771.  In October 2008, she was treated on at least five occasions for a headache that would not retreat.  Then, in December 2008, she was treated on at least four occasions for similar headaches.  A non-severe impairment is one that amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities.  *See Bowen v. Yuckert,* 482 U.S. 137, 153 (1987) (O'Connor, J., concurring).  Migraine headaches occurring as regularly as Plaintiff's occurred and sometimes lasting in excess of 14 days, are likely to interfere with a person's ability to perform basic work activities.  Accordingly, on remand, the ALJ should also reconsider the evidence documenting Plaintiff's migraine headaches.

13

IV.     **Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 26th day of January 2012.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)